UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ERIC SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:12-cv-1402 WTL-DML |
| | ) | |
| EXECUTIVE DIRECTOR OF THE | ) | |
| INDIANA WAR MEMORIALS | ) | |
| COMMISSION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiff's Post-Hearing Memorandum in Support of Motion for Preliminary Injunction**

**Introduction**

Mr. Smith wants to engage in a demonstration at the Soldiers and Sailors Monument where he will attend only with himself and his young son.  He cannot do so without obtaining a permit from the Indiana War Memorials Commission ("Commission"), which has a policy that requires a permit even if an individual or small group wishes to demonstrate.  There is no reported case that allows a permit requirement to be imposed on an individual or a small group wishing to demonstrate in a public park setting such as the Commission's properties and numerous cases establish that the Commission's policy violates the First Amendment.

**Facts**

Mr. Smith believes that the following facts have been established through testimony at the preliminary injunction hearing, the documents that are part of the parties' Stipulation Concerning Evidence (ECF No. 33), and the supplemental material introduced at the preliminary injunction hearing.

      1.      The Commission controls the following Indiana-owned properties in downtown

Indianapolis: the Soldiers and Sailors Monument, University Park, the Indiana War Memorial, Veteran's Memorial Plaza, the American Legion Mall, and the USS Indianapolis Memorial.

2.      The Commission controls the sidewalks that surround the properties as well.

3.      There is no restriction on the size of groups that may go to the external portions of the Commission's properties and sit, sunbathe, eat lunch, converse, or engage in similar behavior as the properties are parks open to persons' lawful enjoyment prior to sundown.

4.      However, the Commission has an unwritten rule that applies regardless of the size of the group and provides that if a portion of the Commission's property is to be used for a specific use then before that can occur an application has to be filed.   This will apply to a single person who wants to engage in a protest activity on the Commission's property or the sidewalks surrounding the property, even though it will not apply to a group of 30 people who travel to the Soldiers and Sailors Monument to eat lunch.

5.      The only written information concerning the permit process is contained in the "Indiana War Memorial Commission Facility Use Application Agreement" that is available on the Commission's website or that can be picked up at Commission's offices.

6.      The Application Agreement provides, at page 2, for set fees for each venue based on the size of the group.  It also provides, at page 5,  that "[s]mall events of short duration may be subject to a donation request rather than an event fee.  This determination is by the IWM only and varies on a case by case basis.  Contact the IWM for additional details."

7.      There are no written standards that govern what is a small event and when a waiver can occur. As indicated, it is done on a case-by-case basis.  The evidence at the hearing established that on at least one occasion (the Radical Media Film Shoot at University Park on June 2, 2012) a group of 15-20 persons, that the Commission's witness, Christina Gaither,

conceded was a "small group," had to pay a fee.

8.     The Commission's employee testified at the hearing that the fee may be waived if the individual or group cannot afford to pay it.   However, that is not stated anywhere on the Commission's Application Agreement.

9.     Although the exact amount of the fee appears to be established in the fee schedule set out in the Indiana War Memorial Commission Facility Use Application and Agreement, the Commission also has great discretion to determine the actual permit fee. This is done on a case-by-case basis. There is nothing in writing that sets out any standards for this and it has lead to such discrepancies as:

- A two-day festival, Fiesta Indianapolis, put on by La Plaza, Inc, to be attended by up to 30,000 people on the American Legion Mall and Veterans' Memorial Plaza for which the group was charged $6,000

- Another two-day event, put on by Indy Pride, also on the American Legion Mall and Veterans' Memorial Plaza, to be attended by 50,000 people for which the group was charged $4,000

- A two-day Oktoberfest at the Soldiers and Sailors Monument to be attended by 12,000 to 15,000 persons for which the sponsoring organization, the Columbia Club, was charged nothing

- Two religious groups that utilize a portion of the American Legion Mall and University Park to feed homeless persons for which they are charged $10 for each session.

10.     The Indiana War Memorial Commission Facility Use Application and Agreement provides, at page 5, that:

> In most instances the IWM requires the sponsoring organization to obtain a General Liability Certificate of Insurance.  The insurance policy must have a limit of not less than $300,000 for injury to or death of one person in any one occurrence and not less than $1,000,000 for injury or death of all persons in that occurrence. . . This requirement is waived for governmental agencies hosting events.

11.     Ms. Gaither, an employee of the Commission, has stated that it will waive

insurance requirements if the requirement is cost prohibitive.  However, that is not in writing anywhere and a waiver will be determined on a case-by-case basis.

12.     Insurance may be required, even of small groups of 4-5 persons, if the group is comprised of persons who do not know each other. This is also determined on a case-by-case basis.

13.      The reason that the Commission requires a permit is to allow it to adequately monitor its properties and enable it to avoid conflicting uses of the property. It also would like to know who is using its properties so that it can be compensated in the case of damage to the properties.

14.     However, as indicated, the Commission does not impose any permit requirement on groups of persons who utilize the properties for such things as playing sports on American Legion Mall, even though such activities can certainly damage the properties and also give rise to liability if there are injuries.

15.     The Commission has never denied a permit application.

16.     The external venues of the Commission's properties frequently are not being used for any activities for which permits have been obtained.

17.     At times, if a person appears without a permit and wishes to use the property for an activity that requires a permit Commission staff will take an application and approve the use at that time, although the person may have to provide proof of insurance and pay a fee.

18.     However, the instantaneous application opportunity does not always happens as Mr. Smith, when he and his son went to the Soldiers and Sailors Monument in July of 2012 to engage in a protest, was informed that he had to leave because he did not have a permit.  No one offered to have him apply for an immediate permit.

19.     Mr. Smith wants to return to the Soldiers and Sailors Monument to engage in peaceful protests.  At times he will advertise the event before appearing.  However, he also wants to appear to engage in a protest, without prior announcement, with just his son and he does not want to apply for a permit to engage in a protest where he just plans for the protest to include himself and his son.

20.     Mr. Smith has, since his July, 2012, appearance at the Soldiers and Sailors Monument, acquired renter's insurance that provides $100,000 in liability insurance.

21.     The Commission has specified that if Mr. Smith returns to any of its properties to engage in a protest, even if the protesters are just Mr. Smith and his son, he will need to obtain a permit.

**Argument**

Mr. Smith, in his Memorandum in Support of Motion for Preliminary Injunction (ECF No. 21) and his Reply Memorandum in Support of Motion for Preliminary Injunction (ECF No. 30), has set out in detail why he is entitled to a preliminary injunction and those arguments will not be repeated.  What is clear, however, is that: 1)   courts have consistently found that policies such as the Commission's are unconstitutional on their face insofar as they apply to small groups or solitary protesters and those cases reject similar justifications to those raised in this case by the Commission; 2) although there is no set definition of "small group" the Commission has conceded that a group of 15-20 persons is a small group and cases routinely note that groups of 10 persons or less are "small" ; and 3) while the Commission could certainly promulgate a policy that is constitutional because it exempts small groups, the current policy is facially unconstitutional and, therefore, the preliminary injunction that must issue must enjoin any and all applications of the current policy.

I.    **A detailed review of applicable case law demonstrates that the Commission's requirement of a permit imposed on an individual or small group is facially unconstitutional**

In his original memorandum (at 16-17, 20-21) and reply memorandum (at 12-14) Mr. Smith cited to other court of appeals' cases that had found that permit requirements imposed on small groups or individuals were facially invalid as violating the First Amendment. A closer review of a number of these cases indicate the clear error of the Commission's policy in that they consistently reject requirements that defendants sought to justify for reasons identical or similar to those raised by the Commission in this case.

Thus, in *Grossman v City of Portland*, 33 F.3d 1200 (9th Cir. 1994), the court was faced with an ordinance that prohibited gatherings in city parks for "organized entertainment, demonstration or public gathering, or to make any address" without prior permission that had been applied to a group of 6-8 persons engaged in a peaceful anti-nuclear protest. *Id.* at 1201-02. The City argued, similarly to the Commission here, that the ordnance was necessary to protect the safety and convenience of users of the parks.  *Id.* at 1206.  In finding that the ordinance was unconstitutional as not narrowly tailored because it applied to small groups, the court noted, in language apposite to this action, that:

> In addition, the City's stated interests and the burden that the park ordinance imposed on speech do not sufficiently match.  Consider this:  if Dr. Grossman and his companions had been standing in a group in the park after meeting unexpectedly, and had been discussing gardening, or the Portland Trailblazers, the doctor would not have been arrested.,  While the addition of signs – or T-shorts, or an "address" – would have occasioned the application of [the ordinance], the distinctions are absolutely empty in terms of the ordinance's stated goals.  A group of 100 family members and friends could have had a noisy picnic in the park secure in the knowledge that they would be unimpeded by law enforcement officers, while Dr. Grossman's small group silently carrying signs or wearing T-shirts would have been classified as law-breakers and subject to forcible removal by armed police.

*Id.* at 1206-07. Of course, the evidence in this case is clear, 25 people may gather and go to the

steps of the War Memorial or Soldiers and Sailors Monument for lunch without prior permission, but Mr. Smith needs permission even to engage in a protest with only his son. (*See* Gaither Dep. at 54, ECF No. 20-1).

In *Boardley v. United States Dep't of Interior*, 615 F.3d 508 (D.C. Cir. 2010), a federal regulation made it unlawful to engage in any expressive activity in national parks without a prior permit. *Id.* at 511. Again, analogous to the rationale offered by the Commission for the challenged policy, the United States argued that the regulation furthered the significant interests in: protecting the parks from damage, ensuring that the locations are not populated beyond their capacity, protecting park visitors, preserving the peace and tranquility of the parks, and avoiding interference with park activities. *Id.* at 519. The court agreed that these were substantial interests (*id.*), but concluded that the regulation was unconstitutional on its face because it applied to small groups and individuals.

> The government asserts interests in preventing overcrowding, protecting park facilities, protecting visitors, and avoiding interference with park activities . . . But why are individuals and members of small groups who speak their minds more likely to cause overcrowding, damage park property, harm visitors, or interfere with park programs than people who prefer to keep quiet? . . . We fail to see why an individual's desire to be communicative is a strong proxy for the likelihood that she will pose a threat to park security or accessibility. . . .
>
> The fit between means and ends is far more precise when the [ ] regulations are applied to large groups. The most important function of a permit application is to provide park officials with the forwarding to coordinate multiple events, assemble proper security, and direct groups to a place and time where interference with park visitors and programs will be minimized. These needs arise routinely with large-scale events, but only rarely with small ones.

*Id.* at 522.

In *Cox v. City of Charleston, South Carolina*, 416 F.3d 281 (4th Cir. 2005), the ordinance applied to streets and sidewalks where the government has the interest of protecting "safety, order, and accessibility of city streets and sidewalks." *Id* at 285. However, the court found the

ordinance facially unconstitutional as overbroad and not narrowly tailored because it applied to small groups of only a few people.

> A few simple examples illustrate the over breadth of the Ordinance. Consider three friends who are walking along the sidewalk in down-town [City]. They come upon a newspaper stand displaying a headline that outrages them. So moved by the headline, they walk to the end of the street and hold up handmade signs protesting the headline. Even if their expression does nothing to disturb the peace, block the sidewalk, or interfere with traffic, the Ordinance renders it criminal. . . Similarly, the Ordinance criminalized a small meeting of individual who gather on the sidewalk . . . to hand out religious tracts without first obtaining a permit, even if their expression does nothing to disturb or disrupt the flow of sidewalk traffic. . . Because the City has not established why burdening such expression is necessary to facilitate4 its interest in keeping its streets and sidewalks safe, orderly, and accessible, we hold that the Ordinance "burden[s] substantially more speech than is necessary to further the government's legitimate interests," . . . and therefore facially violates the First Amendment.

*Id.* at 286 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

In *American-Arab Anti-Discrimination Committee v. City of Dearborn*, 418 F.3d 600 (6th Cir. 2005), an ordinance required a permit for, among other things, any organized group engaged in a common purpose or goal along a public street or other public right of way in Dearborn. *Id.* at 608. The court found that the city had a "significant interest in crowd and traffic control, property maintenance, and protection of the public welfare." *Id.* But, it found that the ordinance was not narrowly tailored and void on its face because of its application to small groups as "[i]n most circumstances, the activity of a few people peaceably using a public right of way for a common purpose or goal does not trigger the city of Dearborn's interest in safety and traffic control." *Id.*

In *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022 (9th Cir. 2006), the court, in the course of striking down a portion of an ordinance as not narrowly tailored that required a permit for activities in the city's outdoor public spaces noted, again in language applicable to this case, that:

> [T]he significant governmental interest justifying the unusual step of requiring citizens to inform the government in advance of expressive activity has always been understood to arise only when large groups travel together on streets and sidewalks. . . . Without a provision limiting the permitting requirements to larger groups, or some other provision tailoring the regulation to events that realistically present *serious* traffic, safety, and competing use concerns, significantly beyond those presented on a daily basis by ordinary use of the streets and sidewalks, a permitting ordinance is insufficiently narrowly tailored to withstand time, place, and manner scrutiny.

*Id.* at 1039 (emphasis in original).

The justifications cited by the Commission for its permitting requirement are therefore not unique. When it comes to organized groups, or protesting individuals, in public spaces all governments are concerned about the ability to insure safety and avoid conflicting uses. If these concerns were sufficient to preclude speech without prior permission there would be no community in the United States where speech on public property could occur without the speaker first going through a permitting process. However, there is no appellate case that allows these justifications to be used to require that individuals or small number of protesters obtain permits in order to engage in protest activity. The Commission's policy is obviously unconstitutional. [1]

---

[1]     At the preliminary injunction hearing the Commission again emphasized that it always grants permission, that it may allow a permit to be applied for on the day of an event, and that it may waive fees and insurance costs.  As noted by Mr. Smith in both his original memorandum and reply memorandum, the fact that permission is always granted does not in any way minimize the First Amendment violation. (ECF No. 21 at 14-15; ECF No. 30 at 6-7).  Moreover, it is clear from the evidence that the only document available to persons seeking to apply for permission, the Indiana War Memorial Commission Facility Use Application Agreement, does not indicate:  that a person may apply on the day of an event, that insurance costs may be waived (unless the applicant is a governmental entity); that application fees will automatically be waived for small groups or solitary protesters. Nor is there even a hint of standards that the Commission utilizes in exercising its discretion and in making these admittedly case-by-case determinations.  In *American-Arab Anti-Discrimination Committee*, the Court also found that a requirement that a permit be sought 30 days in advance was unconstitutional even though that requirement could be waived. 418 F.3d at 607.  In rejecting the argument that the possibility of a waiver makes a difference the court noted:

> The city points to this practice of granting waivers as a means of saving the Ordinance from a lack of narrow tailoring.  That is, it contends that, though the thirty-day notice requirement may suppress some spontaneous speech, its practice of granting waivers accommodates spontaneous demonstrations and thus saves the Ordinance.  We find this

II.     **Although it is clear that permitting requirements cannot be imposed on individuals or small groups case law does not define a precise number associated with the term "small group" although the Commission has conceded that a group of 15-20 persons should be considered to be a "small group"**

The Court has asked the parties to address the definition of "small groups" that must be allowed to meet in public spaces without a permit.  There is no definitive number that establishes the boundary between a small and large group.  Instead, courts emphasized that the number must be one that is narrowly tailored to meet the government's interests in "crowd and traffic control, property maintenance, and protection of the public welfare."  *American-Arab Anti-Discrimination Committee*, 418 F.3d at 608.  And, of course, this may change depending on whether the public space is a tiny park or a large mall such as the American Legion Mall or presents "unique concerns" such as the "narrow bottleneck" of Gateway Park where up to 85,000 pass every day.  *Marcavage v. City of Chicago*, 659 F.3d 626, 634-35 (7th Cir. 2011).[2]  The key is that the number for which a permit is allowed must reflect "events that realistically present *serious* traffic, safety, and competing use concerns, significantly beyond those presented on a daily basis by ordinary use."  *Santa Monica Food Not Bombs*, 450 F.3d at 1039 (emphasis in

---

argument unavailing.  Nothing in the Ordinance places permit applicants on notice that the city may waive the thirty-day notice period . . . Furthermore, the city points to no provision in the Ordinance, past practice, or narrowing construction that specifies standards by which it makes its waiver decisions.  While we embrace the broad latitude and flexibility extended to waiver schemes generally . . .  the city of Dearborn's "unwritten policy of waiving the permit requirement" is "opaque," and lacking in sufficient notice and standard to guide city officials. . . It thus fails to save the Ordinance from its lack of narrow tailoring.

*Id.* (quoting *Church of Am. Knights of the KKK v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003)).  Similarly, the willingness of the Commission  to grant waivers and make exceptions does not alter the necessary conclusion that the policy violates the First Amendment.

[2]      However, as Mr. Smith has stressed in his prior memoranda and at the hearing, not even in *Marcavage* did the court allow a permit requirement to be imposed on a small group, instead remanding the question back to the district court after noting that "[a]bsent a greater understanding of the rationale behind the [defendant's] Policy, we are left with the impression that the imposition of burdensome restrictions for small groups at Gateway Park might be overreaching."  659 F.3d at 635.

original).

      In *Cox* the court addressed this question, noting:

> Although we affirm the decision of the district court that the Ordinance is facially unconstitutional to the extent that it applies to small groups, we decline Cox's invitation to announce a numerical floor below which a permit requirement cannot apply. The relevant legislative body (the city council here) is the proper forum for balancing the multitude of factors to be considered in determining how to keep the streets and sidewalks of a city safe, orderly, and accessible in a manner consistent with the First Amendment.  We emphasize, however, that cities have a number of tools at their disposal to meet that goal.  Rather than enforcing a prior restraint on protected expression, cities can enforce ordinances prohibiting and punishing conduct that disturbs the peace, blocks the sidewalks, or impedes the flow of traffic. . . . And, if the legislative body determines that a permit requirement is absolutely necessary to effectuate the relevant goals, it should tailor that requirement to ensure that it does not burden small gatherings posing no threat to the safety, order, and accessibility of streets and sidewalks.  Or, it could require a permit "only when [c]ity services are required because the event interferes with normal vehicular or pedestrian traffic," thereby link[ing] the permit requirement to its practical justification. . . .  At bottom, the legislative body can enact a permit requirement that burdens expression only to the extent necessary to effectuate the city's significant interests, and no more so.

416 F.3d at 287 (quoting *Grossman*, 33 F.3d at 1207).

      Courts have not agonized over whether a group is a "small" one for purposes of the First Amendment as the cases have addressed facts, like those here, which clearly establish that the regulations have been applied to groups sufficiently small that permitting requirements cannot constitutionally be applied. *See, e.g., Knowles v. City of Waco, Texas*, 462 F.3d 430, 436 (5th Cir. 2006) ("Other circuits have held, and we concur, that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest."); *American-Arab Anti-Discrimination Committee*, 418 F.3d at 608 (In speaking of an ordinance regulating activities on public rights of way the court concluded that "[i]n most circumstances, the activity of a few people peaceably using a public right of way for a common purpose or goal does not trigger the city of Dearborn's interest in safety and traffic

control."); *Douglas v. Brownwell*, 88 F.3d 1511, 1524 (8th Cir. 1996) (after finding that a parade ordinance was not narrowly tailored because it required that an application be submitted five days prior to the parade the court expressed "concern" that the permit requirement applied to groups of ten or more persons and noting that "[w]e need say little more, as the protesters have not raised this issue.  We only point out that applying the permit requirement to groups as small as ten persons compounds our conclusion that the parade permit ordinance is not narrowly tailored."); *Grossman*, 33 F.3d at 1202 (noting that the unconstitutional ordinance was applied to a group of 6-8 persons protesting in a park).  Conversely, in *Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002), the Supreme Court upheld a park ordinance requiring that a permit be obtained for "large-scale events" that the ordinance defined as "a public assembly, parade, picnic, or other event involving more than fifty individuals" or utilizing amplified sound. *Id.* at 318.  Therefore, whereas a group of 50 in a public park may be classified as a "large group," groups of around 10 or less are clearly "small groups" absent extraordinary circumstances that are not present here.

Further debate on this is not necessary in this case as Ms. Gaither acknowledged in her testimony that the Radical Media Film Shoot at University Park consisting of 15-20 persons was, in fact, a small group.  This conclusion is not inconsistent with prevailing case law.

### III.   Given that Mr. Smith is likely to succeed on the merits of his claim that the policy is unconstitutional on its face and that the other requisites for a preliminary injunction is met the proper remedy at this point is an injunction prohibiting the enforcement of the policy against Mr. Smith

For the reasons noted above and in his earlier memoranda it is clear that Mr. Smith has demonstrated what is necessary to obtain a preliminary injunction: that he has a reasonable likelihood of success on the merits; that he has inadequate remedies at law and is suffering irreparable harm; and that the balance of harms as well as the public interest weigh in his favor. *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987).   Specifically, the

policy of requiring individuals or even small groups to obtain a permit is facially unconstitutional because, among other reasons, "it is not narrowly tailored to serve the state's interest and any plaintiff could show as much." *Doe v. Prosecutor, Marion County, Indiana*, 705 F.3d 694, 701 n.6 (7th Cir. 2013). Even if a particular plaintiff seeking to engage in a "large group" activity could be required to apply for a permit under a narrowly drawn policy, the plaintiff "could still bring a successful facial challenge because the [policy] 'applie[s] unconstitutionally to others, in other situations not before the court.'" *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973)). The policy is therefore facially unconstitutional.

While there is nothing to preclude the Commission from reformulating its permit policy to exempt individuals and small groups and creating a constitutionally-appropriate policy that is both content-neutral and narrowly-tailored, it is not this Court's role to do so. *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988) ("[W]e will not rewrite a state law to conform it to constitutional requirements."). Therefore, the preliminary injunction that must issue in this case must enjoin the policy's application to Mr. Smith. *See, e.g., ACLU v. Ashcroft*, 322 F.3d 240, 243, 271 (3d Cir. 2003), *aff'd*, 542 U.S. 656 (2004) (finding that plaintiff had demonstrated a probability of success on the merits that a federal law was, among other things, substantially overbroad and affirming a district court's preliminary injunction that had prevented enforcement of the law). Mr. Smith has tendered an appropriate proposed preliminary injunction.

**Conclusion**

As the Supreme Court noted in *Watchtower Bible & Tract Soc'y of New York, Inc. v. Village of Stratton*, "[i]t is offensive not only to the values protected by the First Amendment, but to the very notion of a free society – that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit

to do so." 536 U.S. 150, 165-66 (2002). The Commission's policy that requires a permit to engage in public discourse, even as applied to individuals or small groups, is facially unconstitutional. Inasmuch as all the requirements for the granting of a preliminary injunction are met, one should now issue without bond.

s/ *Kenneth J. Falk*
Kenneth J. Falk
No. 6777-49
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059  ext. 104
fax: 317/635-4105
kfalk@aclu-in.org

Attorney for Plaintiff

## Certificate of Service

I hereby certify that on this 10th day of April, 2013, a copy of the foregoing was filed electronically with the Clerk of this Court. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and the parties may access this filing through the Court's system.

Betsy M. Isenberg
Deputy Attorney General
Betsy.Isenberg@atg.in.gov

Kenneth L. Joel
Deputy Attorney General
Kenneth.Joel@atg.in.gov

/s/*Kenneth J. Falk*
Kenneth J. Falk
Attorney at Law