UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ERIC SMITH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Cause No. 1:12-cv-1402-WTL-DML |
| ) | |
| EXECUTIVE DIRECTOR OF THE ) | |
| INDIANA WAR MEMORIALS ) | |
| COMMISSION, *et al.*, ) | |
| ) | |
| Defendants. ) | |

### ENTRY ON MOTION FOR PRELIMINARY INJUNCTION

This cause is before the Court on the Plaintiff's motion for preliminary injunction. Dkt. No. 8. The Court held a hearing on the motion on March 27, 2013, and the parties submitted post-hearing briefs. The Court, being now duly advised, rules as follows.

### I.  STANDARD

Analysis of a motion for a preliminary injunction proceeds in two phases: a threshold phase and a balancing phase. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of United States of Amer., Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008).

At the threshold phase, the moving party must satisfy three requirements: (1) absent a preliminary injunction, it will suffer irreparable harm in the interim; (2) traditional legal remedies are inadequate; and (3) its claim has some likelihood of success on the merits. *Id.* at 1086. If the movant demonstrates these three requirements, the analysis proceeds to the balancing phase. *Id.*

At the balancing phase, the court weighs the "irreparable harm that the moving party will endure without the protection of the preliminary injunction against any irreparable harm the

nonmoving party would suffer if the court were to grant the requested relief. " *Id.* The inquiry is a sliding scale: "the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Id.* (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984)). Ultimately, the court exercises its discretion "to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Id.* (quoting *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986)).

## II.  BACKGROUND

On July 26, 2012, at approximately 1:30 p.m., Plaintiff Eric Smith and his young son stood and displayed signs at street level on the southwest corner of the Soldiers and Sailors Monument in Indianapolis, Indiana. Smith displayed five two-by-two foot signs protesting the signing of a United Nations treaty that he believes violates the Second Amendment.

After a few minutes, Smith was approached by an employee of the Indiana War Memorials Commission ("the Commission") and told that he needed a permit for his event. Smith responded that he did not need a permit because of the First Amendment. He and his son remained where they were.

Shortly thereafter, Indiana State Police Officers Hall and Sharp approached Smith and reiterated that he needed a permit. Smith indicated that he believed it was unconstitutional to make him leave because he had a First Amendment right to engage in a peaceful and nondisruptive protest. The officers told Smith that if he did not leave the grounds of the monument, he would be arrested.

Smith and his son therefore went across the street to the sidewalk.[1] Pedestrians on the sidewalk obstructed the Smiths' signs and Smith, believing that their message was not being heard, therefore decided to leave. Smith wants to engage in futures protests with just his son, but he has not done so because he does not wish to seek a permit to engage in such protests. Smith does not want to identify himself, nor does he want to describe to the Commission the content of his protest. Finally, Smith would like to return to the Monument to engage in protests in immediate reaction to newsworthy events.

J. Stewart Goodwin, Brigadier General, USAF (Retired), has served as the Executive Director of the Commission since March 5, 2005. In this position, General Goodwin oversees the operation of the Commission and its properties.[2] The Commission operates these facilities in pursuit of its primary mission: to commemorate the valor and sacrifice of the United States Armed Forces and especially to honor Hoosier veterans and Indiana's role in this country's conflicts.

Christina Gaither is the Director of Administration and the Executive Assistant to the Executive Director. She also served as Events Administrator for the Commission from January 2011 through October 2011.

With regard to the permit policy, Ms. Gaither explained that, "[i]f someone would like to utilize the property for a specific use and utilize a specific space, then [the Commission] require[s] a venue rental application to be filled out." Gaither testified that she didn't know

---

[1] The Monument sits at the center of a traffic roundabout at the intersection of Meridian and Market Streets in Indianapolis. A sidewalk circumscribes the traffic roundabout.

[2] The Commission operates two museums, three parks, and 24 acres of monuments, statues, sculptures, and fountains in downtown Indianapolis.

whether the policy was written down, and the Commission has not since pointed to any written record of the policy.

Gaither also explained the fee schedule. She testified that the fee may be waived at times, depending on "who's hosting the event, the nature of the event, and the size of the event." The Commission has "discretion" to waive the fee for certain applicants. Often, when the fee is waived, a donation is requested, but the Commission does not follow up to ensure that a donation is made. Likewise, the requirement of liability insurance coverage is waived on a "case-by-case" basis, depending on the type of group holding the event. Gaither explained that the Commission's event coordinator initially screens the applications, which are then passed on to General Goodwin and Gaither for review.

The review procedure was discussed by Gaither and counsel for Smith at Gaither's deposition. Relevant portions of that conversation follow.

Counsel: Now, if someone comes with signs and says we don't care where we go; we just want to stand somewhere on War Memorial property, they would still need a permit, is that correct?

Gaither: If they have a specific location on the property.

Counsel: Well, what if they don't? What if they just show up and say we can go to the north side of the monument; we can go to the south side of the Soldiers and Sailors Monument, or we can go to the Plaza; we'll just go anywhere, but we have a group, five or six people here, with protest signs. Would they need a permit?

Gaither:  I'm not sure.

Counsel: Who would know?

Gaither: It's something that we would have to determine on that case.

[. . . .]

Counsel: But, of course, I can have a picnic, if it's just myself and my family, we can go sit on the American Legion Mall and have a picnic without permission, is that correct?

Gaither: Yeah.

[. . . .]

| | |
|---|---|
| Counsel: | Now, we have already discussed the fact that if three people decide to go eat lunch, even every day, at the Soldiers and Sailors Monument on the steps, they don't need a permit, is that correct? |
| Gaither: | That's correct. |
| Counsel: | Now, what if the three people eating lunch were avid supporters of President Obama during the election, or Governor Romney, and they came wearing T-shirts and sat there, not eating lunch, just sat there saying we're showing our support for Obama or for Romney or to vote or whatever, would they need a permit for that? |
| Gaither: | We're content neutral. I mean we don't care if you're spreading a message, or if you just want to sit here and, you know, eat your lunch. That is not of concern to us. Of concern to us is when it's your desire to use the specific space for your specific purpose. |
| Counsel: | Well, what if their purpose then, was, you know, we're not eating lunch today; we're encouraging people to vote for a political candidate, and we're going to sit here where cars can see us, same place we always eat lunch, but where cars can see us, and we're going to sit there for three hours so that people see Vote for X. That would need a permit? |
| Gaither: | I don't think so. |
| Counsel: | Why is that? |
| Gaither: | I don't know. That's just outside the realm of anything that we've ever issued a permit for. |
| Counsel: | Well, what if they had signs instead of T-shirts, sat in the same place they always eat lunch, and had signs saying vote for so and so or whatever the issue is, they need a permit? |
| Gaither: | I think yes. |
| Counsel: | So it's the signs that make the difference? What's the distinction? |
| Gaither: | I think the distinction is more for us maybe the engagement with the people around them. |
| Counsel: | Well, if they're wearing T-shirts, and they say whatever, but they're saying vote for President Obama, or we're opposed to this bill, aren't they seeking to engage? |
| Gaither: | I don't know. |

| | |
|---|---|
| Counsel: | So the T-shirts might be a problem, but you just don't know? But the signs would definitely – I shouldn't say problem. The signs would definitely require a permit; the T-shirts you're not sure of? |
| Gaither: | Right. |

Finally, Gaither explained that, if a person appears without a permit and wishes to use the property for an activity that requires a permit, a permit application will be provided to that person on the spot. The Commission will approve that application at that time, although that person may have to pay a fee and obtain insurance coverage.

### III.  DISCUSSION

Smith brings the instant action against the Executive Director of the Commission and Officers Hall and Sharp under 42 U.S.C. § 1983 for violations of his First Amendment rights. He seeks, *inter alia*, an injunction preventing application of the permit requirement. Whether a preliminary injunction should issue is the subject of the instant motion.

#### A.  Standing

The Commission first contends that Smith lacks standing to bring the instant action. Article III of the Constitution restricts the federal judicial power to actual "cases" and "controversies." Constitutional standing thus has three components: (1) the plaintiff must have suffered an injury in fact; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a decision in the plaintiff's favor. *E.g.*, *Ctr. for Ind. Freedom v. Madigan*, 697 F.3d 464, 473 (7th Cir. 2012).

In assessing whether Smith has standing, it is important first to define the elements of the inquiry relative to this case. First, the alleged injury stems from an unwritten policy of the Commission. Gaither testified at the hearing that the policy requires persons to obtain a permit "[i]f their intent is to use the property in a specific manner, and they want a specific area or they want to be on that specific property." Second, the constitutional violation at issue "is not that a

6

permit may be denied, but that a permit has to be applied for at all." Smith Br. at 14, No. 21.

Third, the injury is "not just the threat of arrest," but chilled speech. Smith Resp. at 3, No. 30 (explaining that Smith has "curtailed his desired activities because of the permit requirement"). Fourth, Smith seeks relief in the form of an injunction prohibiting the Commission from applying the policy.[3]

"[C]hilling of protected speech may . . . alone qualify as a cognizable Article III injury, provided the plaintiffs 'have alleged an actual and well-founded fear that the law will be enforced against them.'" *Madigan*, 697 F.3d at 474 (quoting *Virginia v. Amer. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)). Smith has made this showing. The fact that the Commission enforced the permit requirement in July 2012 is evidence of the sound foundation of Smith's fear; the Commission's continued insistence that Smith need only apply for a permit to be able to hold a protest in the future is evidence that the risk of allegedly unconstitutional enforcement is real. *See* Gaither Dep. at 47:19-48:1 (explaining that Smith should have gotten a permit "at some point during the process"); Comm'n Resp. at 27, No. 27 (contending that there is no irreparable harm to Smith because "there is absolutely no evidence that the [Commission] would deny [Smith's] application for an event at the Monument").

The Commission points out that Smith admittedly intended his July 2012 protest to be large,[4] but it now reads Smith to seek an injunction against application of the policy to small

---

[3] As explained in footnote 8 below, the scope of the injunction Smith seeks is unclear.

[4] The evidence of record is that Smith advertised his event in the days leading up to it. He created and handed out 50-60 flyers, advertised the event on Craigslist, Facebook, and Lebanonchatter.com, made three or four telephone calls, and spoke face-to-face with 50-60 people. In one blog entry posted by Smith, he described himself as "trying to get as many supporters as I can." He encouraged readers to "please tell everyone you know so we can spread the word."

groups. Whatever Smith's intent, however, at the time the Commission enforced the policy against him his protest consisted of only two persons, and Smith has now averred that he intends to protest in the future in groups as small as two persons.[5] Such facts are sufficient to establish that Smith has an actual fear of the permit requirement being applied to him if he holds a small protest in the future.

Smith also satisfies the latter two prongs of the standing inquiry. The Commission's decision to implement and enforce its policy is the source of Smith's chilled speech,[6] and an injunction prohibiting the enforcement of that policy would address that same injury. Therefore, Smith has standing to bring this suit.

### B. Threshold Inquiry

When a moving party seeks a preliminary injunction on the basis of a potential First Amendment violation, the third step, likelihood of success on the merits, "will often be the determinative factor." *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004). Here, the "merits" question is whether the Commission's policy violates the First Amendment. Smith asserts it does; the Commission disagrees.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. 1. The First Amendment applies to the states through

---

[5] The Commission contends that this assertion cannot be credited because it "contradicts" Smith's assertion in his deposition that he wants to have large protests in the future. There is no inherent contradiction in these two statements; a wish to have a large protest does not preclude the intent to also have a small protest.

[6] The existence of a present injury is also sufficient to overcome any constitutional or prudential ripeness problems raised by the Commission. *See, e.g.*, *Capeheart v. Terrell*, 695 F.3d 681, 684 (7th Cir. 2012) (discussing the likelihood of future injury); *Wisconsin Right to Life State Political Action Comm. v. Barland*, 664 F.3d 139, 148 (7th Cir. 2011) ("And in challenges to laws that chill protected speech, the hardship of postponing judicial review weighs heavily in favor of hearing the case.").

the Fourteenth Amendment's due process clause. *E.g.*, *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 826 (7th Cir. 1999). Whether limitations placed on speech violate the First Amendment depends on the type of space at issue. Here, it is undisputed that the Monument[7] is a traditional public forum. Traditional public forums – such as streets, sidewalks, and parks – "are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising such rights cannot constitutionally be denied broadly or absolutely." *Marcavage v. City of Chicago*, 659 F.3d 626, 630 (7th Cir. 2011) (quoting *Carey v. Brown*, 447 U.S. 455, 460 (1980)).

Smith's likelihood of success depends in large part on the scope of his legal challenge, which he repeatedly classifies as "facial." The distinction between a facial challenge and an "as-applied" challenge "goes to the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). While an as-applied challenge seeks to vindicate the right of the individual plaintiff, "[w]here the claim and the relief that would follow reach beyond the particular circumstances of the plaintiffs, they must satisfy the standards for a facial challenge to the extent of that reach." *Madigan*, 697 F.3d at 475; *see John Doe No. 1 v. Reed*, 130 S. Ct. 2811, 2817 (2010) (differentiating between facial challenge as to all applications and facial challenge as to subset of all applications and requiring latter to meet standards for facial challenge to extent relief reaches beyond particular circumstances of plaintiffs).

Generally speaking, facial invalidation requires the challenger to show that the law is unconstitutional in every application. *E.g.*, *Bell v. Keating*, 697 F.3d 445, 452-53 (7th Cir. 2012).

---

[7] The Commission insists that the scope of the injunction be limited to the Soldiers and Sailors Monument. Accordingly, it does not address whether the other properties it manages are traditional public forums.

However, in the context of First Amendment claims, the overbreadth doctrine provides an exception to the normal rule regarding the standards for facial challenges. *Id.* On an overbreadth challenge, the challenger need not plead or prove that the law is unconstitutional in every application; rather, content-neutral regulations "suffer from overbreadth and necessitate facial invalidation if their unconstitutional applications against other protected expression outnumber their legitimate ones." *Id.* "The question is one of magnitude" – meaning, "[w]here a sufficient imbalance exists the statute proves facially invalid, not because it lacks any conceivable constitutional application, but because the threat of its enforcement deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *Id.* (quotation marks and citations omitted). At the same time, courts recognize that invalidation on the basis of overbreadth is "strong medicine," and facial challenges are "disfavored." *Madigan*, 697 F.3d at 476. Courts therefore "vigorously enforce the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep," *Id.* (brackets and citations omitted).

In a similar vein, one may raise a First Amendment facial challenge to a statute under the void-for-vagueness doctrine. "[This] doctrine protects against the ills of a law that fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* at 478-79 (citations omitted). In substance, vagueness is a species of facial challenge that often overlaps with overbreadth. *Id.* at 479. Thus, regardless of name, the basic question is the same: "whether the provisions at issue potentially reach a 'substantial' amount of protected speech." *Id.* at 479-80.

10

Here, although Smith raises both kinds of challenges, he fails to adequately articulate either of them.[8] Smith contends that the policy is an overbroad restriction on the time, place, and manner of speech because it applies even to small groups and sole speakers, and Smith's argument has a solid footing, as "a permit requirement is less likely to be content-neutral and narrowly tailored when it is intended to apply even to small groups." *Marcavage*, 659 F.3d at 635. However, Smith has made no attempt to show the policy's relative overbreadth. *Id.* (remanding for assessment in "light of the concerns that are unique to the venue"). In the context of an inquiry that is "factually driven," *id.*, this omission fatally undermines Smith's attempt to show a likelihood of success. The Court is therefore unable to find that it is likely Smith will succeed on the merits of an overbreadth claim.[9]

Smith also argues that the policy is effectively content-based because persons potentially subject to the policy requirement are unable to discern whether they are required to apply for a permit. Smith Br. at 12, No. 21. Smith's challenge is in substance a challenge to the policy as void-for-vagueness, and Smith has a point. Gaither testified that a person who wants to use Commission property for a "specific purpose" must have a permit. Yet, every person who comes in contact with a Commission property uses it for a specific purpose; as Smith pointed out,

---

[8] The relief Smith seeks is, at times, inconsistent with a facial challenge. On one page of his supplemental brief, Smith seeks an injunction "enjoin[ing] any and all applications of the current policy." Smith Supp. Br. at 5, No. 35. However, a few pages later, he requests an injunction that would "enjoin the policy's application to Mr. Smith." *Id*. at 13. Likewise, Smith's proposed injunction enjoins the Commission from applying its permit requirement only to him. Proposed Prelim. Inj. at 2, No. 36-1 (prohibiting application of the policy "against Eric Smith"). And yet, in the next sentence of his proposed injunction, Smith provides: "Nothing in this order prohibits the Indiana War Memorials Commission from creating a new policy that requires prior notice and permission for large groups of persons to engage in certain conduct on its properties, provided that the policy satisfies constitutional requirements." *Id.*

[9] At times, Smith broadens his challenge to the policy as applied to all Commission properties. *E.g.*, Smith Reply at 5 n.4, No. 30. However, Smith offers no evidence or argument regarding the substantial overbreadth of the policy as it is applied to each distinct property.

"eating lunch" is a purpose. Indeed, even a person cutting across the Monument, instead of walking around the Circle, is using the Monument for a specific purpose – as a thoroughfare. However, Gaither admitted that persons eating lunch on the Monument do not need to apply for a permit to do so,[10] and the Court assumes that a person cutting across the Monument would not need a permit either. Furthermore, Gaither herself expressed uncertainty about whether persons eating lunch while wearing political t-shirts would need to apply for a permit. It does appear, then, that the scope of the permit policy is difficult to ascertain; even Gaither expressed uncertainty about what activities are covered. This is constitutionally problematic. However, just as Smith's presentation of evidence and argument on this question relative to overbreadth was woefully inadequate, so too is it insufficient here. Smith has raised a colorable issue, but he has not properly articulated a vagueness challenge. The Court is therefore unable to determine that he will likely succeed on the merits.

Finally, Smith asserts that the policy violates the First Amendment because it vests unbridled discretion in the Commission. "Facial challenges are permitted where a licensing scheme vests discretion in the decision maker," because "such schemes enable officials to self-censor protected expression." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1044 (7th Cir. 2002). Once again, Smith's argument may have merit.[11] The standardless nature of the Commission's policy is no more evident than in Gaither's testimony that the decision whether to require a

---

[10] The Court takes judicial notice of the fact that the Monument is a popular place to eat lunch and is regularly used for that purpose.

[11] Smith also argues that the policy is constitutionally infirm because it provides no guidelines for imposing or waiving fees and insurance. Again, Smith has a point. As with unbridled discretion in terms of whether to require a permit and whether to grant a permit, unbridled discretion is likewise constitutionally problematic as it relates to the decision whether to impose fees and insurance coverage. However, it bears repeating that the relief Smith has requested is an injunction prohibiting enforcement of the permit requirement. Smith has

12

permit is made on a "case-by-case" basis. When an official enjoys unduly broad discretion in determining whether to require a permit, there is a risk that he or she will favor or disfavor speech activities based on their content.[12] *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002) (discussing the same risk regarding the decision to grant or deny a permit). Indeed, "the prohibition against unbridled discretion is a component of the viewpoint neutrality requirement." *Southworth v. Bd. of Regents of Univ. of Wis. Sys.*, 307 F.3d 566, 579 (7th Cir. 2002). However, Smith again fails to sufficiently articulate his challenge. *See, e.g.*, *Weinberg*, 310 F.3d at 1044 (setting forth a two-part test for licensing schemes: (1) the law must confer the government with "substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers"; and (2) the law must have a "close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial

---

therefore clearly taken aim at the requirement of a permit at all, not the additional requirements of fees and insurance coverage. The Court thus declines to address the question of the propriety of the fee and insurance coverage requirements as that issue is not squarely before the Court.

[12] The Commission points out that there is no record of the Commission *ever* denying an application for a permit, much less denying one on the basis of the content of the speaker's message. The Commission also argues that, because General Goodwin and Ms. Gaither took oaths to protect and defend the Constitution, it is "absurd" to suggest that the Commission would "ever act unconstitutionally to deny a person's ability to express oneself." Comm'n Supp. Br. at 6 n.4, No. 37. However, as the Supreme Court has pointed out,

> It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion. Accordingly, the success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so.

*Forsyth Co., Ga., v. Nationalist Movement*, 505 U.S. 123, 133 n.10 (2002) (quotation marks and citations omitted). Furthermore, even if permit applications are uniformly approved, procedural and temporal hurdles inherent in the process nevertheless burden anonymous and spontaneous speech. *See Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 167-68 (2002). Whether it does so unconstitutionally has yet to be determined.

threat of the identified censorship risks.") (quoting *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988)).

In sum, while Smith has raised some serious and colorable concerns, he has not sufficiently articulated his challenges to the policy. The Court is therefore unable to determine that Smith is likely to succeed on the merits based on the record as it now stands.[13] That is not to say that Smith is *unlikely* to succeed, however; it is merely to say that Smith has not yet made the showing the applicable law requires.

### IV. CONCLUSION

For the reasons set forth above, Plaintiff Eric Smith's request for a preliminary injunction is **DENIED**.

SO ORDERED: 04/30/2013

*William T. Lawrence*

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication.

---

[13] Because the Court is unable to find that Smith is likely to succeed on the merits, it does not reach the balancing inquiry.